IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
▆▆▆▆▆▆▆ @YAHOO.COM THAT IS
STORED AT PREMISES CONTROLLED
BY YAHOO HOLDINGS, INC.

Misc No. _____

**UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Michael I. Jones, a Special Agent (SA) of the District of Columbia Office of the

Inspector General (DC-OIG), after being duly sworn, depose and state:

**INTRODUCTION**

1.       I make this affidavit in support of an application for a search warrant for

information associated with an email account, ▆▆▆▆▆▆ @YAHOO.COM (the "Subject

Account"), that is stored at premises controlled by Yahoo Holdings, Inc. ("Yahoo") an email

provider with an address of 701 First Avenue, Sunnyvale, California 94089.  The information to

be searched is described in the following paragraphs and in Attachment A.  This affidavit is

made in support of an application for a search warrant under Title 18, United States Code,

Sections 2703(a), (b)(1)(A), and 2703 (c)(1)(A) to require the service provider to disclose to the

government copies of the information (including the content of communications) further

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review that information to locate the items

described in Section II of Attachment B, using the procedures described in Section III of

Attachment B.

2.      I am a Special Agent with the DC-OIG.  I am an investigative or law enforcement officer of the District of Columbia within the meaning of D.C. Code § 1-301.115a and Title 18 United States Code § 2501(7); that is, an officer of the District of Columbia who is empowered by law to conduct investigations of, and make arrests for, offenses enumerated in the United States Code and D.C. Code.  I am assigned to the Investigations Division of the DC-OIG. I am responsible for investigating fraud, waste, mismanagement and abuse of District of Columbia government resources, in addition to criminal violations that arise as a result of my investigations.  I have been so employed with DC-OIG since January 2014.  I am a graduate of the University of Maryland, with a Bachelor of Science degree in Criminology/Criminal Justice, and of the American Military University, an entity of the American Public University System, with a master's degree in Criminal Justice.  I am also a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program.  Prior to joining DC-OIG, I served for four years as a SA with the United States Department of State, Bureau of Diplomatic Security. During that time, I conducted numerous investigations including, but not limited to, fraud against the United States, and assisted with probable cause searches and arrests applicable to violations of United States, District of Columbia, state and local laws.

3.      The facts and information contained in this affidavit are based on my personal knowledge and observations, my review of records and documents obtained during this investigation, information received from other individuals, including witnesses and members of other law enforcement agencies, and my experience and training as a SA.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1341 (Mail Fraud), 666 (Theft of Public Money, Property or Records), 201 (Bribery), 371 (Conspiracy) and 1028A (Aggravated Identity Theft) have been committed by John Faulkner, Isaiah Johnson, and others known and unknown to the government. There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes, as described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237.

7.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## BACKGROUND OF INVESTIGATION INTO FUNDAMENTALS FOR ACHIEVEMENT AND DCPS COMPENSATORY EDUDCATION PROGRAM

8.     The District of Columbia Public Schools (DCPS) Compensatory Education Program (Comp. Ed.) awards services to eligible students to assist with their educational needs and development.  Students awarded Comp. Ed. services have learning, mental and/or behavioral disabilities that create an educational barrier that prevents the student from reaping the full benefit of his/her education.  Comp. Ed. services may consist of tutoring, individualized education, mentoring, speech therapy, occupational therapy, and behavioral and psychological

analysis.  Once DCPS deems it appropriate for a student to receive Comp. Ed. services, it sends a

notification letter to the student's parent or guardian specifying the Comp. Ed. services awarded

to their child (Comp. Ed. Letter).  The parent or guardian is responsible for identifying an

independent provider to perform the services described in the Comp. Ed. Letter.  After

performing the approved services, a service provider submits two documents to DCPS: (1) a

timesheet reflecting the name of the child for whom services were performed, the tutor/mentor

who performed the services, the number of hours worked, the signature of the parent/guardian,

and the signature of the tutor; and (2) an invoice reflecting the total amount due from one or

more timesheets for which the service provider seeks payment.  The service provider also

routinely submits a copy of the corresponding Comp. Ed. Letter with the initial invoice

submitted for that student.

9.      Fundamentals for Achievement, LLC (FFA) is a limited liability company owned

by John Faulkner and incorporated in the state of Maryland on August 29, 2011.  On September

20, 2011, FFA became an approved DCPS vendor for the Comp. Ed. program.  As a Comp. Ed.

vendor, FFA was eligible to provide educational services to DCPS students including, but not

limited to, mentoring and tutoring.

10.     On behalf of FFA, Faulkner hired people to conduct tutoring and mentoring

services for DCPS students.  Beginning in 2011, Faulkner, on behalf of FFA, submitted invoices

to DCPS for purported services rendered to DCPS students by FFA.

11.     DCPS Compliance Case Managers (CCM) had access to DCPS students' Hearing

Officer Determination (HOD), Settlement Agreements, and Individualized Education Plans

(IEPs).  Additionally, CCMs ensured that DCPS fully implemented a student's HOD, Settlement

Agreement, and/or IEP.  A CCM also ensured that parents of DCPS students who received

Comp. Ed. services were aware of their award and how to obtain the services of independent providers for their child.

12.     Isaiah Johnson was a Compliance Case Manager with DCPS.  Johnson was terminated from DCPS on November 9, 2016.  Johnson's personal email address is the Subject Account.  Faulkner at times refers to Johnson by the nicknames "Fella," "Big Fella," and "Zeke." Johnson also refers to himself at times by the nicknames "Fella" and "Zeke."

## PROBABLE CAUSE

13.     An investigation conducted by DC-OIG and the Federal Bureau of Investigation has revealed that Faulkner, Johnson, and others known and unknown to the government engaged in a scheme to defraud the Comp. Ed. program.  Specifically, the investigation has revealed instances in which Faulkner assigned a FFA employee to provide services for a student who had received a Comp. Ed. Letter but then inflated the number of hours listed on the timesheet submitted to DCPS.  In other instances, FFA did not provide any services to a student and Faulkner submitted timesheets to DCPS representing that services were performed.

14.     All of the timesheets submitted to DCPS by Faulkner, some of which are described in more detail below, listed FFA's address as 2828 10th St., NE, Washington, D.C. 20017.  All of the timesheets identified "John A. Faulkner, Jr." as the supervisor of the mentor/tutor listed.

15.     On March 18, 2015, your affiant interviewed Person A at Person A's place of employment in Prince George's County, Maryland.  Person A is the parent of D.H., a DCPS student.  During the course of the interview, your affiant showed Person A a copy of a FFA timesheet and a Comp. Ed. Letter submitted to DCPS as well as a FFA invoice requesting payment in the amount of $650.00 for services rendered to D.H.  The FFA timesheet indicated

that Person B, a FFA tutor, provided services to D.H. pursuant to the Comp. Ed. Letter.  The

Comp. Ed. Letter was dated December 8, 2014, and was issued and signed by a DCPS CCM.

The dates of services listed on FFA's timesheet were January 20, January 27, and February 3,

2015.  In total, the FFA timesheet indicated that D.H. received ten hours of tutoring services.

Person A told your affiant that D.H. did not receive any services from Person B, Faulkner, FFA,

or any individuals associated with FFA.

16.     Person A further stated that in early 2015, Faulkner came to Person A's residence,

introduced himself and advised Person A that his company, FFA, would be providing services

for D.H.  Person A had never contacted Faulkner and did not know how Faulkner knew D.H. had

been awarded Comp. Ed. services.

17.     On October 15, 2015, your affiant interviewed Person C, and Person C's child N.

B., at their residence in Washington, D.C.  During the course of the interview, your affiant

showed Person C and N.B. a copy of a FFA timesheet and a Comp. Ed. Letter submitted to

DCPS along with FFA invoices requesting payment in the amount of $10,600.00 for services

rendered to N.B.  The FFA timesheet indicated that Person D, a FFA Tutor, provided services to

N.B. pursuant to N.B.'s Comp. Ed. Letter.  The Comp. Ed. Letter was dated April 27, 2011, and

was issued and signed by a DCPS CCM.  The dates of services listed on FFA's timesheets

indicated that purported services began in or around January 2012 and ended in or around April

2012.  In total, the FFA timesheets reflected that N.B. received 144 hours of independent

counseling.  Person C and N.B. told your affiant that N.B. did not receive any services from

Person D, Faulkner, FFA, or any individuals associated with FFA.  Person C stated that Person C

never received a Comp. Ed. Letter for N.B.  Person C further stated that the date of birth listed

for N.B. on the Comp. Ed. Letter was wrong and, in fact, was the date of birth for one of Person

C's other children.  Your affiant queried DCPS's student records databases and did not identify a Comp. Ed. Letter for N.B.

18.     On October 22, 2015, your affiant interviewed Person E at Person E's place of employment in Washington, D.C.  Person E is the parent of T.T., a former DCPS student. During the interview, your affiant showed Person E a copy of a FFA timesheet and a Comp. Ed. Letter submitted to DCPS along with invoices requesting payment in the amount of $12,967.50 for services rendered to T.T.  The FFA timesheet indicated that T.T. had received services from Person F, a FFA Tutor, pursuant to T.T.'s Comp. Ed. Letter.  The Comp. Ed. Letter was dated April 27, 2011, and was signed and issued by a DCPS CCM.  The FFA timesheets also indicated that purported services began in or around December 2011 and ended in or around April 2012. In total, the FFA timesheets reflect that T.T. received 165 hours of educational services.  Person E told your affiant that T.T. did not receive any services from Person F, Faulkner, FFA, or any individuals associated with FFA.  Your affiant queried DCPS's student records databases and found that T.T. received services from Magari Consulting, LLC.  Person E confirmed that T.T. received services from Magari Consulting, LLC.

19.     Johnson assisted Faulkner and FFA by attempting to identify potential FFA tutors. For example, on December 12, 2011, Johnson, using the Subject Account, emailed numerous individuals and stated "Hello, All I am a alum from Bowie State University and you may or may not know me but the name is Zeke…The purpose of this email to inform you that a colleague of mine is currently looking for a few good professionals that's interested in tutoring and mentoring children with disabilities in the DMV area…For more information or if interested please send resume and contact Mr. John Faulkner…"  Your affiant believes this is an instance in which Johnson assisted Faulkner and FFA by soliciting his contacts for potential FFA tutors.

20.     In another instance, on August 7, 2012, Johnson, using the Subject Account, replied to an email Faulkner forwarded to him about an FFA tutor's resignation.  Johnson's email stated "We need to get some providers ASAP.  When I pee screen the Canadians for my job here I stumbles across two individuals that may be good for FFA.  So I'll give it two weeks before I call then about FFA."  Your affiant believes this email reflects how Johnson assisted Faulkner and FFA by recruiting potential tutors and further shows, through his use of the pronoun "we" in the first sentenced quoted above, that Johnson viewed himself is a partner in the FFA endeavor.

21.     One of FFA's tutors who received an email solicitation from the Subject Account was Person G.  FFA invoices dated November 15, 2012, and accompanying timesheets submitted to DCPS, indicate Person G tutored and counseled DCPS student J.M. for a total of 160 hours.  Of the 160 hours of purported tutoring and counseling, 57 hours of tutoring and 36 hours of counseling are listed as having taken place prior to August 28, 2012, the date on which Person G first contacted Faulkner indicating her interest in working for FFA.

22.     On March 23, 2017, Person G was interviewed by Special Agents of the FBI and provided copies of her email communications with Faulkner.  Person G stated that she tutored J.M., but only for approximately ten hours total.  The interviewing agents showed Person G copies of timesheets submitted to DCPS by FFA for tutoring and counseling allegedly provided by Person G to J.M., including for the time period June to August 2012.  Person G stated she never worked with J.M. for as many hours as reflected on the timesheets and never tutored J.M. in June 2012, July 2012, or August 2012.  Therefore, your affiant believes the FFA timesheets had been fraudulently altered to make it appear as if Person G provided more hours of counseling and tutoring services than she actually provided.

23.     Johnson, using the Subject Account, provided Faulkner with Comp. Ed. Letters

on a number of occasions.  For example, on October 14, 2012, Johnson, using the Subject

Account, emailed Faulkner with the subject "plan" and attached a file with the name "1.pdf"

which was an unsigned Comp Ed. Letter for J.M. dated March 30, 2012, authorizing 100 hours

of tutoring and 60 hours of counseling with a deadline for completion of November 30, 2012.  A

signed version of this Comp. Ed. Letter for J.M. was submitted to DCPS along with FFA's

invoice and fraudulent timesheets for services supposedly provided to J.M. but were not, in fact,

provided.

24.     Johnson also financially benefitted from FFA.  For example, on July 3, 2013,

Faulkner emailed Johnson at the Subject Account without a subject with an attachment titled

"Sum Payout June 5, 2013 Invoices.xlsx."  The relevant portion of attachment is shown below.



The attachment Faulkner emailed to Johnson is a spreadsheet that your affiant believes indicates

that Faulkner split FFA's proceeds with Johnson, a.k.a. "Fella," and that the tutoring and

counseling was likely not provided for the invoices referenced as the providers themselves were

not paid.  Specifically, the title of column M is "$Fella" and your affiant believes the amounts in

his column reflect the amounts Faulkner paid to Johnson from the proceeds for the listed

invoices.  The title of column L is "$John" and your affiant believes the amounts in his column

reflect the amounts Faulkner kept for himself from the proceeds for the listed invoices.  The

amounts listed as totals for the "$Fella" and $John" columns are both $6,506.10.  Therefore,

your affiant believes the spreadsheet reflects that, after a $2,500 payment to "Big Bird" and the deduction of taxes, Faulkner and Johnson evenly split the proceeds FFA received from tutoring and counseling services billed to DCPS by the four listed invoices.

25.     Additionally, unsent emails from Faulkner's account detail amounts given to "Zeke" a.k.a. Johnson.  For example, in an email on June 9, 2013, the subject and body of the email stated "Gave Zeke $2000."  In another email dated November 11, 2013, the subject and body of the email stated "Give Zeke $17,000 of $28,900 on 11/7/2013."  Continuations of this email dated November 22, 2013, included the added line in the body of the email stating "Give Zeke $7000 of $11,900 on 11/22/2013."  Another continuation of this email dated December 6, 2013, added another line in the body of the email stating "Give Zeke $4000 which equals $28,000 kept $900 for furniture for the office.  His balance is starting from zero as of now."

26.     Your affiant obtained a copy of Faulkner/FFA's Internal Revenue Service Forms 1099 generated by the D.C. Office of the Chief Financial Officer, for fiscal years 2011 through 2014.  The forms reveal that Faulkner/FFA was paid $455,826.10 during these years.

## BACKGROUND CONCERNING EMAIL

27.     In my training and experience, I have learned that Yahoo provides a variety of on-line services, including electronic mail ("email") access, to the public.  Yahoo allows subscribers to obtain email accounts at the domain name yahoo.com, like the email account[s] listed in Attachment A.  Subscribers obtain an account by registering with Yahoo.  During the registration process, Yahoo asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo are likely to contain stored electronic communications (including retrieved and un-retrieved email for Yahoo subscribers) and information concerning subscribers and their use of Yahoo services, such as account access information, email transaction information, and account

application information.  In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

28.     A Yahoo subscriber can also store with the provider files in addition to emails,

such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to

emails), and other files, on servers maintained and/or owned by Yahoo.  In my training and

experience, evidence of who was using an email account may be found in address books, contact

or buddy lists, email in the account, and attachments to emails, including pictures and files.

29.     In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account.  Such

information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number).  In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users.  Based on my training and experience, I know

that even if subscribers insert false information to conceal their identity, I know that this

information often nevertheless provides clues to their identity, location, or illicit activities.

30.     In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems.  This

information can include the date on which the account was created, the length of service, records

of log-in (i.e., session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage

of the account.  In addition, email providers often have records of the Internet Protocol address

("IP address") used to register the account and the IP addresses associated with particular logins

to the account.  Because every device that connects to the Internet must use an IP address, IP

address information can help to identify which computers or other devices were used to access

the email account.

31.     In my training and experience, in some cases, email account users will

communicate directly with an email service provider about issues relating to the account, such as

technical problems, billing inquiries, or complaints from other users.  Email providers typically

retain records about such communications, including records of contacts between the user and

the provider's support services, as well records of any actions taken by the provider or user as a

result of the communications In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

32.     As explained herein, information stored in connection with an email account may

provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct

under investigation, thus enabling the United States to establish and prove each offense-element,

or, alternatively, to exclude the innocent from further suspicion.  From my training and

experience, I know that the information stored in connection with an email account can indicate

who has used or controlled the account.  This "user attribution" evidence is analogous to the

search for "indicia of occupancy" while executing a search warrant at a residence.  For example,

email communications, contacts lists, and images sent (and the data associated with the

foregoing, such as date and time) may indicate who used or controlled the account at a relevant

time.  Further, information maintained by the email provider can show how and when the

account was accessed or used.  For example, email providers typically log the IP addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Finally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation.  For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

33.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo! who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,


_____
Michael I. Jones
Special Agent
Office of the Inspector General
Government of the District of Columbia

Subscribed to and sworn to before me this _____ day of July, 2017

_____
HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with ███████████@YAHOO.COM that is stored at premises controlled by Yahoo Holdings, Inc, a company that accepts legal service at 701 First Avenue, Sunnyvale, California  94089.

## ATTACHMENT B

### Particular Information to be Seized

## I.      Information to be disclosed by Yahoo Holdings, Inc. (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, webpages, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account, from August 1, 2011 to the present, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails;

b.      The contents of all chat messages and logs associated with the accounts, including stored chat messages and logs;

c.      The contents of all SMS messages and logs associated with the accounts, including stored SMS messages and logs;

d.      The files and contents associated with the accounts related to Yahoo services such as, but not limited to:  Yahoo Groups, Yahoo Messenger, Yahoo Briefcase, Yahoo search history, Yahoo Profile, Yahoo Sites, Yahoo voice and voicemail and Yahoo photos;

e.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP

address used to register the account, log-in IP addresses associated with session times and dates,

account status, alternative email addresses provided during registration, methods of connecting,

log files, and means and source of payment (including any credit or bank account number);

   f.  The types of service used;

   g.  All records or other information stored at any time by an individual using the

account, including address books, contact and buddy lists, calendar data, pictures, and files;

   h.  All records pertaining to communications between the Provider and any person

regarding the account, including contacts with support services and records of actions taken.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and/or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1341 (Mail Fraud), 666 (Theft of Public Money, Property or Records), 201 (Bribery), 371 (Conspiracy), and 1028A (Aggravated Identity Theft) including for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Records and information relating to person(s) who created, used or communicated using the account in Attachment A, including records about their identities and whereabouts;

(b) Communications with John Faulkner or any other employee or agent of Fundamentals for Achievement, LLC (FFA);

(c) Communications with any individual or entity related to FFA or District of Columbia Public Schools (DCPS);

(d) Records and information regarding Compensatory Education Services such as timesheets, invoices and/or payment requests;

(e) Communications with any DCPS vendor and/or individual that provided and/or billed for Compensatory Education Services;

(f) Records and information relating to communications regarding Compensatory Education Letters or Individualized Educational Plans;

(g) Records and information relating to communications regarding prospective employment as a tutor, mentor, or any other position, for any person with John Faulkner and/or FFA;

(h) Disposition of proceeds from the illegal activity;

(i)   Steps taken in furtherance of the scheme;

(j)   Any and all evidence indicating in any way a motive to engage in criminal activity, such as receiving money or gifts in exchange for the names of DCPS students eligible for the Compensatory Education program;

(k)   Financial records and documents relating to assets or accounts accessed by Isaiah Johnson or others engaged in criminal conduct;

(l)   Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(m)   Evidence indicating the email account owner's state of mind as it relates to the criminal activity under investigation;

(n)   Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

### III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC**
**BUSINESS RECORDS PURSUANT TO FEDERAL RULE**
**OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Yahoo Holdings, Inc., and my official title is _____.  I am a custodian of records for Yahoo Holdings, Inc.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Yahoo Holdings, Inc. and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Yahoo Holdings, Inc., and

c.      such records were made by Yahoo Holdings, Inc. as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____        _____
Date                                              Signature